# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs March 6, 2013

## RODNEY McALISTER v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Lauderdale County**
**No. 8506   Joseph H. Walker, III, Judge**

---

**No. W2012-01190-CCA-R3-PC  - Filed May 22, 2013**

---

The Petitioner, Rodney McAlister, appeals the Lauderdale County Circuit Court's denial of his petition for post-conviction relief from his 2009 conviction for vandalism of more than $1000 but less than $10,000 and his five-year sentence.  The Petitioner contends that he received the ineffective assistance of counsel.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JERRY L. SMITH and ROGER A. PAGE, JJ., joined.

Rebecca S. Mills, Ripley, Tennessee, for the appellant, Rodney McAlister.

Robert E. Cooper, Jr., Attorney General and Reporter; Kyle Hixson, Assistant Attorney General; D. Michael Dunavant, District Attorney General; and Joni R. Livingston, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case arises from the Petitioner's destroying West Tennessee State Penitentiary property during his 2008 imprisonment.  This court summarized the facts of the case in the appeal of the Petitioner's conviction:

> The defendant, after kicking his cell door, managed to escape the cell and was free inside the pod.  The defendant was seen smashing the cameras by the control room and proceeded to climb into the ceiling, after breaking several of the ceiling tiles.  The defendant continued on his rampage, breaking another camera, knocking out lights, and breaking a sprinkler head. Officers in the pod ordered the defendant to come down from the ceiling, and he responded that

he would when he was finished. The defendant did eventually come down from the ceiling, and, upon reaching the ground, he ran back into his cell. The entire episode was captured on video.

. . . .

At the . . . trial, the defendant proceeded upon the theory that he had committed the acts under duress or necessity, claiming that he was being abused by the prison officers and was only trying to get the attention of someone who could stop the treatment. The defendant testified and stated that the problems began when he got into an argument with an officer at the prison. He claimed that the officers then began "messing" with his food, sometimes even depriving him of anything to eat. He testified that he would be given food which had dirt, cleaning solvents, or pubic hairs in it. He related that he went on a "hunger strike" to draw attention to the alleged abuse. The defendant testified that he became weak from lack of food and that the officers attempted to take him to the prison physician. When he refused to go, the defendant related that the extraction team was called to remove him from his cell. He alleged that on multiple occasions during these extractions, he was beaten, dragged down stairs, and returned to his cell unconscious. He also contended that he was denied privileges such as showers and recreation time and that he was written up for infractions which he did not commit.

According to the defendant, he wrote the warden on multiple occasions concerning this abuse, but he received no aid. He stated that he feared for his safety and came up with the idea to destroy property in order to force officials to recognize his plight. He acknowledged that, prior to the incident, he destroyed two cells for which he was now charged. He claimed that on the day in question, the officer in the control room, who controlled the doors to the cells, began taunting him that he could not get out. The defendant claimed that this officer released the electronic lock and dared him to try to get out, despite the fact that the deadbolt lock was still in place. The defendant acknowledged that he then burst through the door, breaking the lock, and then committed the acts of vandalism for which he was charged.

. . . .

The State called multiple officers to testify who were on duty when the defendant committed his rampage. Each testified that when the defendant burst from his cell, nothing in his demeanor indicated that he was afraid or had

been threatened in any way. Each of the officers also testified that they never witnessed or saw any abuse of the defendant, that his food was not tampered with, and that he was not denied privileges. Additionally, no officer was able to testify exactly how the defendant had gotten out of his cell. The control officer specifically testified that she did not release the lock for his door.

The State also called the warden to testify at the defendant's trial, although at the time of the incident he had been the deputy warden. He testified that he had received two letters from the defendant prior to this incident. In each of the letters, the defendant demanded that he be transferred to another prison, asserting that he wanted to be closer to Knoxville, and he set a deadline for the transfer to occur by December 1. The warden testified that he attempted to have the defendant transferred but was unable to find an institution willing to accept him. In the letters, the defendant also demanded that a disciplinary action be taken off his record because it was a "lie." The warden further testified that neither letter mentioned any abuse or improper treatment at the hands of prison officials. The warden also testified that when he engaged the defendant in conversation in the pod, he did not recall any mention or allegations of problems with the defendant's food.

*State v. Rodney McAlister*, No. W2010-00996-CCA-R3-CD, slip op. at 1-3 (Tenn. Crim. App. June 7, 2011).

At the post-conviction hearing, counsel testified that although he was retained to represent the Petitioner at the trial, he was not retained to file a motion for a new trial and was permitted to withdraw as counsel before the deadline to file the motion. He said he met with the Petitioner twice for one to two hours at the prison to discuss the vandalism charge and filing a lawsuit against the Tennessee Department of Correction. He denied requesting the Petitioner's medical and psychiatric records or requesting information about the Petitioner's medication. He denied that he and the Petitioner discussed his medications and that he knew the Petitioner was prescribed Tegretol at the time of the incident. He agreed the Petitioner had been in solitary confinement before the incident but did not recall the Petitioner's receiving treatment for self-mutilation. He said that presenting evidence of the Petitioner's head trauma, medications, and hospitalization would have been inconsistent with the duress defense presented at the trial.

Counsel testified that although he did not recall sharing the State's discovery materials with the Petitioner, his usual practice was to provide clients copies of discovery. He did not recall the Petitioner's asking him to have a locksmith examine the prison door that opened to determine if Corporal Harbor opened the door or if it malfunctioned as the State claimed.

He did not recall cross-examining a locksmith at the trial. He said the majority of letters related to the Petitioner's case came from the Petitioner's mother. He did not recall the Petitioner's questioning Corporal Harbor's character during the trial and said he did not know that her employment was terminated due to a sexual relationship with an inmate.

Counsel testified that he recalled the Petitioner's alleging he was assaulted by officers at the prison but that he did not recall the officers' names. He said he evaluated the allegation as part of the duress defense rather than as a ground to attack the officers' credibility. He denied knowing that Officer Snow's employment was terminated as a result of "problems at the prison." He denied receiving material related to the personnel files of the correction officers. He denied that any information related to the correction officers' employment would have changed the outcome of the trial because there was a video recording of the Petitioner's destroying prison property. He denied researching the psychological impact of solitary confinement but said it was "elementary" that solitary confinement had psychological consequences. He denied choosing not to address the solitary confinement at the trial and said it was part of the duress defense. He said that he filed a sentencing memorandum, that he thought he included the applicable mitigating factors, and that he did not recall which mitigating factors were included.

On cross-examination, counsel testified that he had practiced law for twenty-eight years and that criminal defense had been fifty percent of his practice since 1990. He agreed he relied on the information provided by his clients in preparing for a trial and said he did not recall the Petitioner's telling him about his medications. He agreed he raised necessity and duress defenses at the trial. He agreed he called as witnesses three inmates from the prison. He recalled locksmith Tommy Owen testifying that the cell door lock could be manipulated into opening. He said that a letter written by the Petitioner to Staten Hidle was received as an exhibit at the trial and that the Petitioner requested a transfer to another facility and threatened "consequences" if not transferred. He agreed that one of the consequences of which the Petitioner spoke was vandalism of prison property.

Counsel testified that he and the Petitioner discussed possible defenses and strategies and that the Petitioner agreed with the duress defense. He said the Petitioner appeared to understand their conversations, the proceedings, and the charges against him. He agreed information regarding the correction officers was presented though the affirmative defenses. He acknowledged requesting a sentence concurrent with the sentence the Petitioner was serving at the time of the incident. On redirect examination, counsel stated that he and the Petitioner probably reviewed the State's discovery material just before the jury was selected.

The Petitioner testified that he had a tenth-grade education, that he attended a "special school" because of behavioral and learning disabilities, and that he and counsel discussed his disabilities and self-mutilation. He said he told counsel about head trauma he suffered as a result of a car accident and his treating physicians, but he did not know if he told counsel where the surgeries were performed.

The Petitioner testified that he and counsel met twice and that one of the meetings occurred before the vandalism charge was filed. He said that he had been in solitary confinement almost the entire time he had been housed at the prison. He said that a "steel cell" was built for him and that he was released recently. He said he explained to counsel how solitary confinement made him feel and how he was treated while there. He agreed he had access to a psychiatrist and a counselor while in solitary confinement, but he did not "consider her a real psychiatrist" because she only wanted to talk. He said that a counselor came to see him but that the counselor "put his hands on" the Petitioner.

The Petitioner testified that at the time of the hearing, he was taking half as much Tegretol as he took at the time of the incident. He said that he suffered from a mood disorder while he was on the full dose of Tegretol and that he explained to counsel how the medication affected him. He said that he talked about Tegretol's effect at the trial but that the prosecutor and jury "chalked it up as really being nothing."

The Petitioner testified that he did not mention the solitary confinement at the trial and that he did not know "to bring it up." He said that he received counsel's request for discovery in the mail and that he first saw the State's discovery package in court. He said he knew there was a video recording of his actions but did not know the State had pictures of his long hair and beard, which were the result of his not being permitted to shave or have his hair cut. He said he did not know he could view the recording in prison. He said he did not know of a letter he wrote to his girlfriend discussing his desire to stab Officer Snow, who assaulted him. He said he told counsel about Officers Snow's and Harbor's character issues. He said he communicated with counsel through his mother.

The Petitioner testified that the locksmith who testified at the trial stated that the Petitioner manipulated the lock on the cell door and was able to open the door at any time. He said that during the trial, he told counsel that if the locksmith's testimony were true, a light would have been visible in the control room. He said he wanted counsel to ask the locksmith several questions, but counsel did not. He said he broke things inside his cell to obtain the warden's attention. He said he wanted to talk to the warden about the correction officers' mistreating him. He said that the correction officers built the steel cell, welded closed the buttons that dispensed water, forced him to drink from the toilet, and laughed at him. He said he wrote the warden and did everything he could to stop the officers' treatment.

He said he attempted to testify about the officers' assaulting him, but the State objected and established that the Petitioner was not assaulted the day he vandalized prison property.

The Petitioner testified that after the last correction officer was moved to a different location, he did not have any more incidents at the prison. He said that after he vandalized the property, he returned to his cell, and he denied attempting to hurt anyone. He said he vandalized prison property for attention and hoped he would be moved. He stated that he was unable to tell the jury he would have been required to place something in the lock to prevent the door from locking and that it was impossible to have done so because his hands were handcuffed behind his back and he was escorted by officers every time he was placed in his cell. When asked why he was unable to tell the jury this, the Petitioner said counsel told him that counsel was not a locksmith.

On cross-examination, the Petitioner testified that he destroyed the prison property intentionally and that his actions were necessary in order for prison officials to transfer him. He agreed counsel raised a necessity defense at the trial but said the jury did not believe him because it did not hear evidence of "the whole thing." He said the jury did not hear evidence "about that lock" or about the correction officer's having sex with prison inmates. He admitted that he called as witnesses three inmates and that evidence of his taking Tegretol was presented at the trial.

The trial court denied post-conviction relief and concluded that counsel did not provide ineffective assistance. The court found that counsel investigated the Petitioner's case adequately and was not deficient in presenting the Petitioner's duress and necessity defenses. It found that the Petitioner failed to establish how his medical history would have aided his defense. Regarding the Petitioner's explanation for his vandalizing prison property, the court stated that the jury rejected the necessity defense and that the Petitioner failed to show how counsel should have presented additional factual information or that such information would have been successful. The court noted that the Petitioner testified at the trial about many of his current complaints. This appeal followed.

The Petitioner contends that he was denied the effective assistance of counsel. He argues that counsel (1) failed to provide the Petitioner with discovery materials, (2) failed to investigate the State's witnesses, (3) failed to question the State's witnesses effectively, (4) failed to explore and present evidence supporting duress and necessity, (5) failed to present evidence of the Petitioner's medical history, (6) failed to meet with the Petitioner adequately, discuss trial strategy with the Petitioner, and prepare for the trial adequately, (7) failed to present evidence at the sentencing hearing regarding the Petitioner's mental illness, previous head injury, and psychiatric medications, (8) failed to present evidence of the Petitioner's lengthy solitary confinement and the psychological impact of his confinement, (9) failed to

file mitigating factors with the court and object to the State's enhancement factors, (10) failed to file a motion for a new trial and discuss with the Petitioner his not filing a motion, and (11) failed to object to the trial court's ordering consecutive sentencing. The State responds that counsel provided the effective assistance of counsel and that the trial court properly denied relief. We agree with the State.

The burden in a post-conviction proceeding is on the petitioner to prove his grounds for relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2012). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. *Id.* at 457. Post-conviction relief may only be given if a conviction or sentence is void or voidable because of a violation of a constitutional right. T.C.A. § 40-30-103 (2012).

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is on the Petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). In other words, a showing that counsel's performance fell below a reasonable standard is not enough because the Petitioner must also show that but for the substandard performance, there is "a reasonable probability that . . . the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The *Strickland* standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. *State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the *Strickland* test. *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997). The performance prong requires a petitioner raising a claim of ineffectiveness to show that counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability means a "probability sufficient to undermine confidence in the outcome." *Id.*

With regard to counsel's failure to provide the Petitioner with discovery materials, counsel testified that although he did not recall sharing the State's discovery package with the Petitioner, his usual practice was to provide his clients copies. He stated that he and the

Petitioner probably reviewed the State's discovery materials just before the trial. Likewise, the Petitioner testified that he received counsel's request for discovery in the mail and that he reviewed the discovery materials before the trial. The Petitioner knew the State possessed a video recording of his vandalizing prison property. We note the Petitioner testified at the trial that he vandalized the property and that he acted under duress because of the treatment he received from various correction officers. The Petitioner has failed to establish that he was prejudiced by counsel's failure to provide him the State's discovery package earlier.

With regard to counsel's failure to investigate and question the State's witnesses effectively, we conclude that the Petitioner is not entitled to relief. Counsel knew of the Petitioner's allegations against the correction officers and the treatment the Petitioner claimed he endured during his solitary confinement. Although counsel did not request the officers' personnel files, counsel evaluated the allegations as part of the duress defense rather than as a means of impeaching the officers' credibility. Counsel concluded that even if an officer had a relationship with an inmate and the termination allegations were true, the information would not have changed the outcome of the trial because the Petitioner's vandalizing prison property was recorded and played for the jury. In any event, counsel did not believe impeaching the officers' credibility would outweigh the recording showing the Petitioner's actions.

With regard to the treatment the Petitioner allegedly endured by the correction officers, the Petitioner testified at the trial that he was being abused by the officers and that his vandalizing prison property was an attempt to get the warden's attention. The Petitioner testified about his arguing with an officer and the officers' placing dirt, cleaning solutions, and pubic hairs on his food, depriving him of food on occasion, assaulting him, and denying him showers and recreation time. The Petitioner testified that he wrote the warden several letters about this treatment, that he received no response from the warden, and that he decided to vandalize prison property. We note that the warden's trial testimony contradicted the Petitioner's testimony. The warden testified that none of the Petitioner's letters mentioned any mistreatment and that the Petitioner failed to mention his being mistreated when they spoke in the prison pod. The jury credited the warden's testimony at the trial, and counsel presented evidence of the necessity and duress defenses. The Petitioner is not entitled to relief.

With regard to counsel's failure to present evidence of the Petitioner's medical history and the effects of the lengthy solitary confinement, counsel and the Petitioner discussed trial strategy during their two meetings at the prison, and the Petitioner agreed to the strategy and defenses. They also communicated through the Petitioner's mother. The Petitioner did not discuss his medical history or mental health with counsel, and the Petitioner did not display symptoms of mental illness. Counsel concluded that the Petitioner understood their

conversations, the proceedings, and the charges against him. Although counsel knew the Petitioner was in solitary confinement before the vandalism charge, he did not recall the Petitioner's receiving treatment for self-mutilation. Counsel testified that evidence of the lengthy solitary confinement was included in the duress defense. Although presenting evidence of the Petitioner's head trauma, his medications, and his hospitalization might have aided the duress and necessity defense, the Petitioner testified at the post-conviction hearing that he discussed his medication at the trial but that the prosecutor and the jury "chalked it up as really being nothing." The Petitioner has failed to establish prejudice.

With regard to counsel's alleged failure to meet adequately with the Petitioner, discuss trial strategy, and prepare for the trial adequately, we conclude that counsel was not deficient. Counsel met with the Petitioner twice at the jail to discuss the vandalism charge and a lawsuit against the Tennessee Department of Correction. Counsel and the Petitioner admitted that they communicated through the Petitioner's mother, and counsel stated that the majority of the letters related to the vandalism case came from the Petitioner's mother. The evidence shows that counsel and the Petitioner discussed the necessity and duress defense, that the Petitioner agreed to the defense strategy, and that counsel prepared for the trial accordingly.

With regard to counsel's failure to present evidence at the sentencing hearing related to the Petitioner's mood disorder, previous head injury, psychiatric medications, lengthy solitary confinement, and the psychological impact of the solitary confinement, we conclude that counsel was not deficient. The Petitioner testified that he discussed his medical history and medication at the trial and that the jury and prosecutor "chalked it up as really being nothing." Evidence of the Petitioner's solitary confinement was presented at the trial as part of the duress and necessity defenses. No evidence was presented at the post-conviction hearing showing how additional evidence would have changed the outcome of the trial or the sentencing hearing. The jury was presented evidence related to the Petitioner's mental health, previous medical history, and solitary confinement.

With regard to counsel's failure to file mitigating factors with the court and to object to the State's enhancement factors, we conclude that counsel was not deficient. The record shows that counsel filed a sentencing memorandum on November 5, 2009. Counsel argued that mitigating factors (1), (2), and (12) applied. *See* T.C.A. §§ 40-35-113(1) (2010) ("The defendant's criminal conduct neither caused nor threatened serious bodily injury"); -113(2) ("The defendant acted under strong provocation"), and -113(12) ("The defendant acted under duress . . . , even though the duress . . . is not sufficient to constitute a defense to the crime").

The State argued that enhancement factors (1) and (13)(I) applied. *See* T.C.A. § 40-35-114(1) (2010) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range") and -114(13)(I)

("At the time the felony was committed . . . the defendant [was] incarcerated in any penal institution on any misdemeanor or felony charge or a misdemeanor or felony conviction"). Counsel's sentencing memorandum addressed enhancement factors (1), (6), and (13)(I). Regarding the Petitioner's criminal history, counsel argued that the Petitioner's criminal history was contained in the presentence report and that he did not challenge the information in the report. Regarding factor (13)(I), counsel argued that it should carry minimal weight because the affirmative defenses of duress and necessity arose within the prison setting. Counsel argued that the vandalism would not have occurred had the correction officers treated the Petitioner humanely and noted that the Petitioner never denied causing the damages. Counsel also brought to the court's attention that enhancement factor (6) applied. *See id.* at §40-35-114(6) ("The . . . amount of damage to the property . . . was particularly great."). Counsel argued, though, that the jury verdict showed that the damage amount ranged from $1000 to $10,000 and that the trial court should presume the lowest possible amount and fix the damage amount at $1000. We conclude that counsel presented mitigating factors for the court to consider in his sentencing memorandum and that he argued against the State's requested enhancement factors. The Petitioner is not entitled to relief.

With regard to counsel's failure to file a motion for a new trial and discuss with the Petitioner his not filing a motion, we conclude that the Petitioner is not entitled to relief. Counsel testified that he was retained to represent the Petitioner at the trial and at the sentencing hearing and was not retained to file a motion for a new trial. The appellate record of the Petitioner's conviction shows that the sentencing hearing was held on December 18, 2009, and that counsel filed a notice of withdrawal on December 22, stating that his representation of the Petitioner ended with the conclusion of the sentencing hearing. This record contains no additional information regarding counsel's withdrawal. On February 17, 2010, the Petitioner filed a pro se motion for appointment of counsel to file a belated direct appeal, alleging that counsel failed to file a motion for a new trial "to raise issues of errors made by the trial court at trial or at sentencing or errors made by the state at trial or sentencing." The trial court granted the Petitioner's motion.

Although counsel testified at the post-conviction hearing that the trial court permitted counsel to withdraw before the deadline to file the motion, no evidence exists showing why counsel was permitted to withdraw before filing a motion for a new trial or why the court failed to appoint subsequent counsel for filing the motion. Also, no evidence was presented showing whether counsel and the Petitioner discussed the parameters of counsel's representation or whether counsel told the Petitioner about the importance of filing the motion. These questions were not asked of counsel at the hearing. On appeal, the Petitioner only challenged the sufficiency of the evidence, arguing the State failed to negate the necessity and duress defenses. At the post-conviction hearing, the Petitioner failed to show the issues he would have presented on appeal had counsel filed a timely motion for a new

trial. *See Wallace v. State*, 121 S.W.3d 652, 659 (Tenn. 2003) (stating that a petitioner "must establish that he or she intended to file a motion for new trial and that but for the deficient representation of counsel, a motion for new trial would have been filed raising issues in addition to sufficiency of the evidence").

With regard to counsel's failure to object to the trial court's ordering consecutive sentencing, we conclude that the Petitioner is not entitled to relief. The Petitioner asserts that the court erred by ordering the sentence to be served consecutively to the effective ten-year sentence he was already serving as a result of multiple convictions in Knox County. He also asserts that the court violated *State v. Wilkerson*, 905 S.W.3d 933 (Tenn. 1995), by not finding that consecutive sentencing was reasonably related to the severity of the offenses and necessary to protect the public from further criminal conduct.

At the hearing, the Petitioner did not present any evidence of counsel's alleged ineffectiveness other than counsel's filing a sentencing memorandum and did not offer the sentencing hearing transcript as an exhibit. In any event, a transcript of the sentencing hearing was included in the appellate record of the Petitioner's conviction.

At the sentencing hearing, the Petitioner testified that he never denied vandalizing prison property and that he took responsibility for his actions. He said no one was injured during the incident. He said that when he left his cell, he did not approach the guard but vandalized the property he wanted to destroy and returned to his cell. He admitted he had an anger management problem. He said that after the trial, the medical staff stopped providing his medication around November 15, 2009, that he broke some items, and that he spit on the guards. He blamed his most recent behavior on his medication. He said taking Tegretol twice daily stabilized his mood. He said that although he was taking his medication again, he was not yet taking a full dose. He said that he believed his anger issue would resolve itself with a full dose of Tegretol.

The Petitioner testified that although he should not have destroyed prison property, he knew what he was doing and that he acted out of necessity. He said he was scared because he was beaten several times, starved, given contaminated food, and dragged. He requested leniency.

On cross-examination, the Petitioner testified that he was taking Tegretol at the time of the incident but that it was a low dose. He agreed that he blamed medication for his most recent outburst. He said that he destroyed the property because he had an anger management problem, not simply because he did not get his way. He admitted that he had an attitude problem and that although he chose to act on his anger, he snapped. He said, though, that his destroying prison property was more than his snapping. He said that he knew what he was

doing during his most recent outburst but that he did not think about the consequences because he "tripped out."

Although the presentence report was not included in the appellate record of the conviction, the trial court stated that it had received and reviewed the report and found that the Defendant was a multiple offender based on his prior convictions. The court found that mitigating factor (1) applied. *See* T.C.A. § 40-35-113(1) ("The defendant's criminal conduct neither caused nor threatened serious bodily injury"). The court found that enhancement factor (1) applied. *See* T.C.A. § 40-35-114(1) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range"). The court found that the enhancement factor outweighed the mitigating factor and sentenced the Petitioner to five years. The court found that the Petitioner was incarcerated at the time of the offenses and that he was an offender whose record of criminal activity was extensive. The court ordered consecutive sentences.

The determination of concurrent or consecutive sentences is a matter left to the discretion of the trial court and should not be disturbed on appeal absent an abuse of discretion. *State v. Blouvet*, 965 S.W.2d 489, 495 (Tenn. Crim. App. 1997). Consecutive sentencing is guided by Tennessee Code Annotated section 40-35-115(b) (2010), which states, in pertinent part, that the court may order sentences to run consecutively if it finds by a preponderance of the evidence that "the defendant is an offender whose record of criminal activity is extensive." T.C.A. § 40-35-115(b)(2).

Our supreme court concluded that when the imposition of consecutive sentences is based on the trial court's finding the defendant to be a dangerous offender, the court must also find "that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." *State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995); *see State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999).

The trial court ordered consecutive sentences because the Petitioner had an extensive history of criminal activity and was incarcerated at the time of the offense. Although the presentence report was not included in the record, no evidence exists contradicting the court's factual findings. Further, the court did not order consecutive sentences based on *Wilkerson* and was not required to find that consecutive sentences were "necessary to protect the public against further criminal conduct by the defendant" and were "reasonably relate[d] to the severity of the offenses committed." *Wilkerson*, 905 S.W.2d at 939.

We conclude that counsel was not deficient by failing to object to the trial court's ordering consecutive sentencing. The court properly imposed consecutive sentences and was not required to make findings pursuant to *Wilkerson*. The Petitioner testified at the sentencing hearing about his medication and its effect on his mood, his anger management problems, the reason for his destroying prison property, and the treatment he claimed to have endured by the correction officers. The trial court ordered consecutive sentences based on the Petitioner's previous convictions, and nothing in the record contradicts the court's findings. We conclude that counsel's performance at the sentencing hearing was not deficient and that the Petitioner is not entitled to relief.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE